## Diehl et ux. v. The Zoning Hearing Board of Lower Milford Township

*Donald Van Gilder* and *Earl Heffner,* for appellants.

*Edward McGee* and *Margo Wiener,* for appellees.

BACKENSTOE, *J.*, January 30, 1981 — This matter is before us on appeal from the decision of the Zoning Hearing Board of Lower Milford Township (board). At issue are several zoning questions arising from appellant's use of their land as a commercial trout hatchery. The tract consists of approximately 9.5 acres and is located in an R-30 residential zoning district. Appellants charge that it was error for the board to hold that the hatchery is not a permitted use within the district and, in the alternative, that the ordinance is unconstitutional as exclusionary, that the board erred in ruling that appellants had no vested rights in the operation of

the hatchery and that the board erred in denying a variance.

We have carefully reviewed the entire record before the board as well as the board's extensive written decision and the briefs and arguments of counsel before this court. Since additional testimony has not been taken our standard of review is whether the board committed an abuse of discretion or an error of law: Southland Corporation v. East Caln Township Zoning Hearing Board, 45 Pa. Commonwealth Ct. 591, 405 A. 2d 1078 (1979); Kraiser v. Zoning Hearing Board of Horsham Township, 45 Pa. Commonwealth Ct. 277, 406 A. 2d 577 (1979).

Preliminarily, we find that the findings of fact made by the board are amply supported by the evidence and thus are adopted by this court. They are as follows:

1. This is the appeal of Howard A. Diehl, Jr. and Leslie J. Diehl of R.D. No. 2, Box 628, Coopersburg, Pa.

2. The applicants filed an application dated June 13, 1980, seeking an interpretation and variance relating to their property located at the intersection of Churchview Road and Hoffman Lane in Lower Milford Township, Lehigh County, Pa.

3. The tract in question is irregular in shape, consists of approximately 9.5 acres and is located within an R-30 zoning district.

4. The applicants purchased the property which is the subject of this application on or about November 1, 1977, and paid $96,000. for the same.

5. The property was purchased from G. Warren Grossman and Mary Elizabeth Grossman who owned it from 1962 to 1977.

6. At that time there was a single-family dwell-

ing located on the property together with several out buildings and structures which were farm related.

7. In addition to the structures, there is also located on the property a pond and a stream.

8. Approximately 90 percent of the property is located in a flood plain.

9. One and a half to three acres of the 9.5 acres had been used for crop farming for many years prior to the date of purchase.

10. In its natural state, only one-half of the property is suited for agricultural uses, such as a crop farming; the other one-half being too wet in the spring and early summer as a result of surface springs.

11. The applicants purchased the subject property for use as a residence and currently reside there. It was also their intention to attempt to make a profit as a result of the purchase.

12. At the time of purchase the applicants did not examine township ordinances or regulations to determine what, if any, use or uses were permitted or prohibited.

13. In February of 1978, the applicants determined that the property was suitable for the raising of trout and embarked on the creation and establishment of what has variously been referred to as a trout hatchery or fish farm.

14. Christopher Gillette served as the Zoning Officer of Lower Milford Township from January 1977 to July 1979.

15. He was succeeded by Robert M. Spadt, Jr. who has been the Township Zoning Officer from August 1979 to the present time.

16. The property which is the subject of this application is surrounded by agricultural and residential uses.

17. In April of 1978, applicants commenced construction of the first of five raceways and completed construction in May of 1978. A raceway is used for the breeding and raising of trout.

18. Construction of the second, third and fourth raceways was completed near the end of 1979.

19. Construction of the fifth raceway was completed sometime in January 1980.

20. The applicants did not file applications for permits for any of the five raceways nor were any permits issued for the construction of any of the five raceways.

21. On March 7, 1978, the applicants applied for a building permit to construct a detached garage on their property and the accompanying sketch did not depict any of the raceways or related buildings.

22. On July 24, 1978, the applicants filed an application for a building permit for a hatch house and on that application depicted the proposed hatch house and one raceway.

23. On October 30, 1978, the applicants filed an application for a building permit for the construction of an out building to store an emergency generator which was depicted on a sketch together with a hatch house and one raceway.

24. On March 30, 1979, the applicants filed an application for a building permit for the construction of a garage and the accompanying sketch depicted four things, namely; a barn, a home, the existing garage and proposed garage.

25. On September 28, 1979, the applicants filed an application for a building permit for the construction of an out building to store an emergency generator and the accompanying sketch depicted the existence of three raceways on the property, together with other buidings not material or relevant to this appeal.

26. Water for the first raceway originally came from a stream which runs through the property.

27. Sometime in the summer of 1978, the first of four wells was drilled and water from that well was blended with the stream water for the first raceway.

28. A second well was drilled in the late summer or early fall of 1979, and the third and fourth wells were drilled in January of 1980.

29. The four wells located on the applicants' property originally produced approximately 1.2 million gallons per day.

30. At the present time and for the last several months the wells have been producing approximately 900,000 gallons per day.

31. As a result of the aforesaid pumping, at least six wells of surrounding property owners have been affected.

32. The affected wells are:

| Name of property owners | Approximate distance from applicants' well | Approximate date affected |
|---|---|---|
| 1. Robert L. Bolton | 800 feet | April 10, 1980 |
| 2. John E. Pfeiffer | 300 feet | May 1980 |
| 3. Marilyn Heffernan | 600 feet | March 1980 |
| 4. Albert Klan | 800 feet | January 1980 |
| 5. Marjorie Werley | Unknown | November 1978 |
| 6. Edwin Schantz | 1500 feet | February 1980 |

33. The effect on the wells as above noted constitutes an adverse impact on the health, safety and welfare of the community.

34. The effect on the wells as above noted has had an adverse impact on surrounding property values.

35. At no time prior to the hearings held in this matter did the applicants ever inform any township

official of the exact nature and extent of the use to be made of the property.

36. The applicants did not act in good faith or with due diligence in that regard.

37. During the week of July 12, 1979, Jasper Dreibelbis, a township supervisor, met with Howard Diehl and had an extended discussion with him concerning the use being made of the property.

38. At that meeting, Mr. Dreibelbis informed Howard Diehl of the possible need for permits from various agencies and authorities.

39. Subsequent to that meeting, construction at the subject property accelerated.

40. Construction and operation expenses prior to the meeting between Dreibelbis and Diehl approximated $110,000 exclusive of land acquisition costs.

41. Subsequent to the meeting between Dreibelbis and Diehl, $250,000 was expended by the applicants in connection with the construction and operation of the trout hatchery.

42. The applicants appeared before the zoning hearing board as a result of actions instituted against them by the township.

43. Notice of hearings were properly published and evidentiary hearings in this matter were held on July 21, July 22, August 5, August 11 and September 9.

44. The board rendered an oral decision on September 9, 1980.

45. The applicants appeared at all of the public hearings and were represented by Donald L. Van-Gilder, Esq.

46. Lower Milford Township appeared in opposition to the application and was represented by Donald Lipson, Esq.

47. There were also numerous objectors who

were unrepresented but who appeared, testified in opposition to the application and were made parties to this proceeding.

We hold first that the board was correct in ruling that the hatchery is not a permitted use in an R-30 district. Appellants have attempted to bring their trout hatchery within the definition of "crop farming," which is a permitted use in the district. Zoning Ordinance of Lower Milford Township, §541.2 (ordinance). Crop farming is defined by the Ordinance as: "The raising and keeping of field, truck and tree crops with the intent of producing capital gain or profit or with the intent of selling any field, truck or tree crops. For the purposes of this ordinance, the term 'CROP FARMING' shall include plant and tree nurseries." Ordinance, §320. On its face it is clear that a fish hatchery is not a field, truck or tree crop. Indeed, we are hard pressed to see how one could reach a different conclusion.[1]

Appellants' reliance on Department of Agriculture regulations defining "farm" to include fish farms is inapposite. Not only were those regulations drafted for purposes unrelated to the zoning of Lower Milford Township, "farm" is therein used and defined in its broadest sense and includes property used to produce crops or livestock, including fish. The ordinance in question clearly distinguishes crop farming from animal husbandry. See: Ordinance, §§309, 320. The board was thus justified in disregarding the Department of Agriculture regulations upon which appellants rely in de-

---

1. The word "crop" has been defined to mean, "everything produced from the earth by annual planting, cultivation, and labor," and, "the product of cultivated plants while growing, or that product after it has been harvested or severed from the root or stock to which it was attached." 21 Am.Jur. 2d, Crops §1.

termining that a trout hatchery is not a permitted use.

We decline to rule on the merits of appellants' challenge to the constitutionality of the ordinance because the issue was never raised properly before the board. The exclusive method for challenging the validity of an ordinance is provided by the Municipalities Planning Code of June 1, 1972, P.L. _____, as amended; 53 P.S. §11001, 11004. Therein, it is provided at 53 P.S. §11004(2)(a), that, "[t]he landowner shall make a written request to the board . . . that it hold a hearing on his challenge." The written request must contain certain information designed to inform the board of the matters at issue and the grounds for the challenge. Since appellants failed to submit to the board a written challenge, the board properly refused to consider a constitutional challenge.[2] The facts of this case are similar to those in Phelan v. Zoning Board of Lower Merion Township, 19 Pa. Commonwealth Ct. 63, 339 A. 2d 612 (1975) in which a landowner applied for a variance but raised orally at the hearing the discriminatory effect of the zoning ordinance. It was held that the constitutional challenge was not properly raised. Similarly, the constitutional challenge in the instant case was raised orally at a hearing convened to consider other zoning questions and was thus not properly raised.[3]

Appellants also argue that they have acquired

2. See: Greene Township v. Kuhl, 32 Pa. Commonwealth Ct. 592, 379 A. 2d 1383 (1977).

3. We would add that the board's determination that fish raising falls withing the definition of "animal husbandry," a permitted use in certain areas of the township, does not appear unreasonable. Accordingly, the constitutional issue would appear somewhat academic.

certain vested rights in the use of their tract as a commercial fish hatchery, even though it is in violation of the zoning ordinance, because the zoning officer issued various permits to them and told them that a permit for a raceway would not be necessary. It is significant that of the five permits issued to appellants, all were issued as accessory uses to the permitted residential use. Two were for a garage to store non-commercial vehicles and two were for buildings to house emergency generators. The zoning officer testified that it is common for people in the township to have emergency generators for their homes and that he was satisfied that Mr. Diehl intended to use his generator for that purpose. Thus, only the permit for a hatchhouse was related to a fish hatchery, so far as the zoning officer was aware, and even with that one there was testimony that the zoning officer believed that the Diehls were operating a hobby, not a commercial enterprise.[4] At no time did appellants request a permit to operate a commercial enterprise in a residential district before they were ordered to do so by this court on May 16, 1980.

It is not unreasonable to conclude that appellants' plan to construct a large hatchery with a total of nine raceways supporting hundreds of thousands of fish was formed long before it was actually implemented or revealed to township officials. Mr. Diehl testified that the facility was of his own design. Much of the money used to finance the construction was secured in 1979 from the proceeds of a Farm Home Administration loan. The raceways and wells which appellants installed in

4. In fact, there was testimony that both zoning officers as well as other officials believed that appellants were developing a hobby.

1979 and 1980 were necessary only because thousands of eggs were hatched in the Fall of 1978 and the growing fish required the additional space and water. All of this obviously required considerable forethought, planning, and preparation. It is equally obvious that appellants made no attempt to enlighten the zoning officers of the full scale of their intentions. Indeed, considering the magnitude of their plans, the information they did provide is so misleading it amounts to misinformation.

Further, appellants' haste to complete construction after being informed by Supervisor Dreibelbis of the need for approval from the Delaware River Basin Commission and other agencies, but before they made the requisite applications, strongly suggests that their strategy was to complete their development as fully as possible before enforcement proceedings could be brought to force them to obtain the necessary permits.[5] The strategy in fact succeeded to a great extent because the board, the DRBC, the DER and the township are now faced with a fait accompli, achieved by a great investment and change of circumstances on the part of appellants.

With the posture of the case thus understood, we are satisfied that appellants have not acquired vested rights in the operation of the hatchery. Where a permit is issued illegally by a zoning officer who is operating under a mistake of fact, it confers no vested rights upon the person to whom it is issued, even if expenditures have been made in reliance upon the permit: Appeal of Donofrio, 31 Pa. Commonwealth 579, 377 A. 2d 1017 (1977). The permits issued in the instant case, as well as the repre-

---

5. After that date, four of the five raceways and two or three of the four wells were completed.

sentation that no permit would be necessary to operate a raceway were all made under the mistaken belief that the uses were to be as accessory uses to the residence or that appellants were operating a hobby.[6] As noted, appellants made no effort to inform the zoning officers of their true and complete intentions.

In Petrosky v. Zoning Hearing Board of Upper Chichester, 485 Pa. 501, 402 A. 2d 1385 (1979), the Supreme Court set forth certain criteria as to whether vested rights have accrued as a result of permits issued by the government. Those five factors are delineated at 485 Pa. 507, 402 A. 2d 1388:

"1. . . . due diligence in attempting to comply with the law;

2. . . . good faith throughout the proceedings;

3. . . . expenditure of substantial unrecoverable funds;

4. . . . expiration without appeal of the period during which an appeal could have been taken from the issuance of the permit;

5. . . . insufficiency of the evidence to prove that individual property rights or the public health, safety or welfare would be adversely affected by the use of the permit."

While it is obvious that appellants have satisfied the third factor, they do not qualify as to the remainder.

In our view, appellants' conduct indicates that due diligence and good faith have not been shown. Disclosure to the authorities of their full intentions

---

6. Of course, the board found that the first raceway was fed initially with spring water alone. The zoning officer who viewed that raceway did not know that appellants intended to dig wells and draw on underground water reserves, thereby greatly expanding their fish-raising capacity.

was, we believe, the minimum the township had a right to expect from appellants. Their piecemeal disclosure on sketch plans included with applications for permits for accessory uses that one or more raceways existed in no way satisfied their obligaion to deal with the township in good faith. Further, their lack of due diligence is amply demonstrated by their hasty construction after being informed of the need for various permits.

Further, appellants have not satisfied the fourth factor because they have never applied for a permit for a fish hatchery.

Finally, there was clearly sufficient evidence presented to prove that individual property rights and the public health, safety and welfare would be adversely affected by the operation of the hatchery as intended by appellants.[7]

In sum, we are satisfied that the board's determination that vested rights in the operation of the fish hatchery did not accrue to appellants by virtue of action or inaction by the township officials. The lack of good faith and due diligence shown by appellants, coupled with the harmful effects which are being caused by the hatchery clearly justified the board's decision.

Finally, we turn to appellant's alternative argument that it was error for the board to deny them a variance. The standards to be applied in considering a request for a variance are well established and have been codified by the Municipalities Planning Code of July 31, 1968, P.L. 805, 53 P.S. § 10912. These requirements have been summarized as follows: (1) the ordinance imposes and unnecessary hardship on the property; (2) the hardship results

7. See the final section of this opinion on the variance issue.

from the unique physical characteristics of the property; (3) the granting of a variance will not have an adverse impact on the health, safety and welfare of the general public; (4) the hardships must not be self-inflicted; and (5) the variance sought is the minimum variance that will afford relief. See Marple Gardens, Inc. v. Zoning Board of Adjustment, 8 Pa. Commonwealth Ct. 436, 303 A. 2d 239 (1973); A&D, Inc. v. Zoning Hearing Board, E. Nottingham Township, 32 Pa. Commonwealth Ct. 367, 370, 379 A. 2d 654, 656 (1977).

The board made certain findings of fact which are supported by the evidence and clearly justify its denial of the variance as requested by appellants.

The board, for example was justified in its conclusion that the operation of the hatchery as it existed prior to the hearing adversely affected the welfare of the community and would impair the development of nearby property. While the testimony of appellants' real estate appraiser was that the value of other land in the community would not be devalued as a result of the fish hatchery causing some residential wells to go dry,[8] his opinion was discredited by testimony of appellants' own geologist that other wells in the township could be affected by continued pumping of the hatchery well, that there was no guarantee that those wells which had been deepened after going dry would not need to be deepened again and that if the population of the township grew the water table would drop even further. Appellants' geologist testified that in his opinion normal precipitation should replenish the water table adequately but that a

8. He stated that the problems with those wells had been corrected so that property values would resume their normal level.

drought would reduce the amount of water available to all users. Although a geologist for the township did not testify before the board, appellant's geologist testified that the rate at which he anticipated the water table to be recharged was considerably greater than that anticipated by Mr. Pennington, the township's geologist.[9] The disparity between the positions of the two experts is considerable: appellants' geologist's most optimistic figure was two million gallons per day while Mr. Pennington's was 900,000 gallons per day.[10]

The potential for continued water shortage problems in the township if appellants' variance as requested was granted clearly justified the finding of the board that the welfare of the community as well as the development of the property in the township would be adversely affected. The board as trier of the facts was not bound to accept the opinions of appellants' experts even as to those matters in which they were uncontradicted: Morrissey v. Dept. of Highways, 424 Pa. 87, 225 A. 2d 895 (1967). The events which have developed since the zoning hearing, including the finding by the DRBC hearing officer that at least 13 wells have been adversely affected,[11] certainly indicate that the board was justified in disregarding much of the

---

9. Appellants' geologist himself testified to the recharge rate as computed by the township's expert, Mr. Pennington.

10. The recharge rate accepted by the DRBC hearing officer to represent actual conditions at the site is 498 gallons per minute, or 717,120 gallons per day.

11. Seven more than were found by the board to be adversely affected at the time its hearings were held.

expert testimony.[12] While there was conflicting testimony on these points, it was for the board to resolve the conflict: A&D, Inc. v. Zoning Hearing Board of E. Nottingham Twp., 32 Pa. Commonwealth Ct. 367, 372, 379 A. 2d 654, 657 (1977).

Appellants have argued that the board had no power to consider the question of ground water withdrawal since the Delaware River Basin Commission was itself considering their application for water allocation. While we certainly have no quarrel with the jurisdiction of the DRBC to determine ground water allocation pursuant to the guidelines of the Delaware River Basin Compact, the board in applying and enforcing the Township Zoning Ordinance must also review the consequences of a particular land use upon the health, safety and welfare of the township.

It is significant that review of a project by Federal and state agencies other than the DRBC is clearly foreseen by the regulations promulgated by the DRBC pursuant to authority granted by the Compact of July 7, 1961, P.L. 518, 32 P.S. §815.101, Art. 14, sec. 14.2. See: 18 C.F.R. §401.33, 401.38 and 401.40. Indeed, had appellants approached this project in an appropriate manner anticipated by the compact, which contains provisions designed

---

12. Although technically limited to the record before us, we see no reason, under the unusual circumstances this case presents, to ignore and disregard the testimony of the township's geologist given in ancillary proceedings before this court and the findings of the hearing officer for the Delaware River Basin Commission regarding appellants' water usage in evaluating the board's finding. The hearing officer found that at least 13 wells had been adversely affected by the hatchery's pumping, and the township's geologist testified that a great many more wells could be adversely affected by continued pumping.

to facilitate intergovernmental cooperation and prevent unnecessary duplication of proceedings, an administrative agreement could have been entered by the DRBC and other Federal and state regulatory agencies to establish the order in which the agencies would consider the project.[13] It is thus clear that a project developer may well be required to satisfy the requirements of multiple governmental agencies, particularly where as here the proposed use is illegal and could only be allowed as a variance. See: Dublin Water Co. v. D.R.B.C., 443 F.Supp. 310 (E.D. Pa. 1977) (Dublin Water Co. required to satisfy the requirements of multiple agencies, including the DRBC, PUC and DER before its well could be put into operation).

In reviewing the record and the findings of the board, we are satisfied that no error of law or abuse of discretion was committed in denying appellants the variance they sought. We are not unsympathetic to appellants' situation in that it appears that part of their land as it existed when they bought it was marshy and incapable of being farmed. Indeed, the board's finding of fact number 10 indicates that only one-half of the property was suited for agriculture. There was testimony, however, that the land could be drained and used for farming. A landowner does not have a right to develop his land to its "highest and best" use, as claimed by appellants, but rather must develop it within the guidelines of the zoning laws, and may never use it to the detriment of the general health and welfare. The board found, we believe correctly, that the variance as requested was harmful to the community.

13. The Pennsylvania Department of Environmental Resources as well as the zoning hearing board had jurisdiction to consider appellants' project.

For that reason we are constrained to dismiss this appeal.

## ORDER

Now, January 30, 1981, for the reasons stated in the accompanying opinion, the decision of the Zoning Hearing Board of Lower Milford Township in the above captioned matter is affirmed. The stay order granted by this court is vacated as of February 7, 1981, unless an extension is granted upon application by any party.